■ In the Matter of WEEKS WOODLANDS ASSOCIATION, INC., et al., Appellants, v DORMITORY AUTHORITY OF THE STATE OF NEW YORK et al., Respondents. [945 NYS2d 263]—

Appeals from order, Supreme Court, New York County (Emily Jane Goodman, J.), entered January 18, 2011, which, to the extent appealed from as limited by the briefs, denied petitioners' motion for a preliminary injunction and granted the cross motion of respondent New York State Department of Health to dismiss the petition as against it, and from order and judgment (one paper), same court and Justice, entered August 9, 2011, which to the extent appealed from as limited by the briefs, granted the motion of respondent Dormitory Authority of the State of New York for summary judgment declaring that it had the authority to provide financing for the subject construction project, denied petitioners' motion to renew, granted the cross motion of respondent New York City Department of Buildings for summary judgment dismissing the proceeding as against it, and denied petitioners' motion for summary judgment with respect to the applicability of section 24-111 (a) of the Zoning Resolution of the City of New York, dismissed, without costs, as moot.

Petitioners seek to enjoin a construction project to modernize a hospital for disabled children operated by a not-for-profit corporation, based primarily on alleged noncompliance with zoning requirements. Petitioners concede that they did not seek injunctive relief against the project going forward upon their appeal to this Court from Supreme Court's denial of their motion for a preliminary injunction. It now appears that the excavation, foundation walls, steel superstructure, concrete slabs, metal stud frames and duct work are complete. We see no evidence that the work was performed in bad faith, and the work completed could not be readily undone without undue hardship. While we would adopt the dissent's cogent analysis of the zoning issue if we were to reach the merits, in view of petitioners' failure to seek injunctive relief from this Court and the advanced stage of work on the project, we find that the appeal has become moot and therefore must be dismissed (*see Matter of Citineighbors Coalition of Historic Carnegie Hill v New York City Landmarks Preserv. Commn.*, 2 NY3d 727 [2004];

*Matter of Dreikausen v Zoning Bd. of Appeals of City of Long Beach*, 98 NY2d 165 [2002]; *Sutherland v New York City Hous. Dev. Corp.*, 61 AD3d 479, 479-480 [2009], *lv denied* 13 NY3d 703 [2009]; *William Israel's Farm Coop. v Board of Stds. & Appeals of City of N.Y.*, 25 AD3d 517 [2006]).

The dissent is mistaken in asserting that the Court of Appeals decisions in *Citineighbors* and *Dreikausen* support the position that this appeal is not moot. At the same time that it recognized that "a race to completion cannot be determinative [of mootness]" (*Dreikausen*, 98 NY2d at 172), the Court of Appeals identified as the "[c]hief" factor in the mootness inquiry "a challenger's failure to seek preliminary injunctive relief or otherwise preserve the status quo to prevent construction from commencing or continuing during the pendency of the litigation" (*id.* at 173). In this case, to reiterate, after Supreme Court denied their motion for a preliminary injunction, petitioners sought no injunctive relief from this Court upon the instant appeal.

Indeed, over a year's time, petitioners repeatedly chose not to apply to this Court for injunctive relief to preserve the status quo pending further proceedings.[1] Hence, by August 2011 (five months before this appeal was argued), bonds in the amount of $102,200,000 had been issued to finance the project, approximately $30 million of the bond proceeds had been drawn down, and, according to the main respondents' initial brief, "excavation and foundations [were] complete, the erection of the steel superstructure [was] 70% complete, the installation of the concrete slabs on the basement floor [was] complete and the concrete slabs on the ground floor [were] 50% complete." In light of this history, the dissent would turn the law on its head by penalizing a not-for-profit institution, and the public agencies cooperating with it, for having gone forward with this project in reliance on (1) the issuance of all necessary governmental permits, (2) Supreme Court's denial of all applications for

---

1. After Supreme Court denied their initial application for a temporary restraining order (TRO) in August 2010, petitioners did not immediately come to this Court to seek interim relief. Petitioners again failed to seek such relief from this Court in January 2011, when Supreme Court denied their first motion for a preliminary injunction. Petitioners again failed to seek such relief from this Court in March 2011, when they moved this Court for other relief in connection with their appeal from the first order under review. Petitioners again failed to seek such relief from this Court in April 2011, when Supreme Court denied their application for a TRO in connection with the renewal of their motion for a preliminary injunction. Finally, petitioners once again failed to seek such relief from this Court in August 2011, when Supreme Court denied their renewed motion.

injunctive relief, and (3) petitioners' failure even to seek injunctive relief from this Court. Stated otherwise, it is the position of the dissent that respondents should have imposed an injunction against proceeding with the project on themselves. We disagree.

Petitioners and the dissent fail to come to grips with the fact that petitioners, by failing to seek injunctive relief from this Court upon any of the occasions when they were denied relief by Supreme Court, are themselves complicit in the project's having reached its present advanced stage. Instead, the dissent makes an emotional appeal, essentially accusing us of coming to the aid of those having "the power and the money to proceed with dispatch" (internal quotation marks omitted), as if this matter concerned a for-profit project aimed at enriching private developers at the expense of local homeowners. Putting aside that the status of the proponents of this project has no particular bearing on petitioners' rights, the dissent seems to have lost sight of the fact that the intended beneficiaries of the project are the sick and disabled children served by respondent hospital, a not-for-profit institution. Although the identity of those to be served by the project is also essentially irrelevant to the issues raised on this appeal, we do not think it accurate to characterize these children as persons well-endowed with "power" and "money."[2] We add that the dissent is simply wrong in saying that respondents have acted "with a blatant disregard for [petitioners'] rights." Respondents have at all times acted under color of law, and their construction of the zoning provision in question, while erroneous, certainly falls within the bounds of reason (especially given that the question is apparently one of first impression), and, after all, was accepted by Supreme Court.

The dissent argues that, to avoid mootness, it sufficed for petitioners to seek injunctive relief in Supreme Court, even if they subsequently failed to apply for such relief upon their appeal to this Court. *Dreikausen* indicates otherwise. In *Dreikausen*, the Court of Appeals cited with approval *Matter of Fallati v Town of Colonie* (222 AD2d 811 [1995]), in which the appeal was found moot because (as summarized by the Court of Appeals) "no injunction [was] sought before [the] Appellate Division" (98 NY2d at 173). The petition in *Fallati* sought, inter

---

2. The dissenter protests too much in asserting that we "stoop[ ]" to characterizing as an emotional appeal his reference to respondents' alleged "power" and "money." Since the resources available to respondents are not legally relevant, the dissent's reference thereto serves no evident purpose other than emotional manipulation. However, if the dissent finds the temptation to make such a reference irresistible, far from being "meanspirited[ ]," it is only fair to take note of the children for whose benefit the project is intended.

alia, "to enjoin [the respondent] from improving or developing [certain] property pending the determination" of the proceeding challenging the compliance of the intended use with zoning rules (222 AD2d at 812-813). The Third Department dismissed the appeal from the dismissal of the petition on the following ground: "Since petitioner did not seek injunctive relief *during the pendency of this appeal,* we find the controversy herein to be rendered moot" (*id.* at 813 [emphasis added]). Similarly, in *Gabriel v Prime* (30 AD3d 955 [2006]), the Third Department dismissed as moot an appeal from a judgment declaring that a contract for the sale of real property had been effectively terminated, where the owner (who sought to avoid the contract) sold the property to a third party after entry of the judgment and "no lis pendens was filed nor a stay issued *following Supreme Court's judgment* in [the owner's] favor" (*id.* at 956 [emphasis added]; *see also Matter of G.Z.T. Indus. v Planning Bd. of Town of Fallsburg,* 245 AD2d 741, 742 [1997] [appeal was dismissed as moot because "(*d*)*uring the pendency of this appeal,* petitioner took no steps to safeguard its interests by, e.g., seeking to temporarily enjoin the planned construction"] [emphasis added]; *Matter of Bytner v City of Albany Bd. of Zoning Appeals,* 211 AD2d 1000 [1995] ["this appeal has been rendered moot in view of petitioner's failure to obtain an injunction protecting his interests during the pendency of this appeal"]; *cf. Vitiello v City of Yonkers,* 255 AD2d 506, 507 [1998] [appeal was not moot where, after Supreme Court denied their application for a TRO against construction and governmental permission to proceed with the project was obtained, "the plaintiffs immediately moved in (the Appellate Division) for a preliminary injunction"]). In view of the foregoing authority, we are mystified by the dissent's assertion that we have "fabricate[d]" the requirement that a party seeking to halt construction move for injunctive relief at each stage of the proceeding.[3]

The dissent's position finds no support in *Matter of Watch Hill Homeowners Assn. v Town Bd. of Town of Greenburgh* (226

---

**3.** Petitioners cite *Matter of Parkview Assoc. v City of New York* (71 NY2d 274 [1988], *appeal dismissed and cert denied* 488 US 801 [1988]), in which the Court of Appeals held that the City was not estopped to revoke the portion of a building permit that erroneously permitted the construction of a greater number of floors than were lawful under zoning requirements, even though the revocation would require the destruction of several floors that had already been built. However, the issue in *Parkview* was not mootness (as here), but whether the circumstances of the case were such as to give rise to a "rare exception to the unavailability of estoppel against governmental entities" (*id.* at 279). Accordingly, *Parkview* is not authority for excusing the failure of private litigants, such as petitioners herein, to seek injunctive relief pending the determination of litigation.

AD2d 1031 [1996], *lv denied* 88 NY2d 811 [1996]), a case that the Court of Appeals distinguished in *Dreikausen* (98 NY2d at 173). The panel that decided *Watch Hill* included two justices of the panel that decided *Fallati* only a few months before and three justices of the panel that decided *G.Z.T. Indus.* about a year and a half later. Thus, we see little merit in the dissent's suggestion that *Watch Hill* abrogates or relaxes the requirement that a party seeking to halt construction move for injunctive relief at each level of litigation. Moreover, nowhere in the *Watch Hill* decision do we find any support for the dissent's assertion that the Court retained jurisdiction of the appeal notwithstanding the petitioners' "failure to repeatedly seek injunctive relief." And, to reiterate, the following year, in *G.Z.T. Indus.*, three of the same justices reaffirmed that an appeal seeking to halt construction may be dismissed as moot where the appellant made no effort to preserve the status quo "[d]uring the pendency of [the] appeal" (245 AD2d at 742).[4]

Also misplaced is the dissent's reliance on *Matter of Friends of Pine Bush v Planning Bd. of City of Albany* (86 AD2d 246 [1982], *affd* 59 NY2d 849 [1983]), another Third Department decision distinguished in *Dreikausen* (98 NY2d at 173). Far from supporting the dissent's contention that the present matter is not moot, *Pine Bush* expressly held that the matter before the Court was moot because the petitioners had not been diligent in seeking injunctive relief against construction activity (*see* 86 AD2d at 247). Indeed, *Pine Bush* found that the matter was moot on the ground that the petitioners, after their motion to extend the automatic stay of the respondent's action was denied, took "no further action" to maintain the status quo, and, on their appeal from a subsequent judgment of the trial court "made no motion for a stay pursuant to CPLR 5519" (*id.*). Because *Pine Bush* did not direct the cessation of further work on the project, the case does not support the dissent's view that we should order a halt to the ongoing work here. While the *Pine Bush* Court, rather than dismissing the appeal, addressed the merits after converting the article 78 proceeding

---

4. As more fully discussed below, where it is contended that an appeal from a court's refusal to stop construction has been rendered moot by substantial completion of the project, the competing interests and equities must be weighed against each other in determining whether or not the appeal should be dismissed. Accordingly, even if the petitioners in *Watch Hill* failed to seek injunctive relief from the Appellate Division after Supreme Court denied their initial application (and nothing in the decision indicates that this was the case), the retention of jurisdiction of the appeal in *Watch Hill* does not constitute authority for retaining jurisdiction in every case having a similar procedural fact pattern.

to an action for a declaratory judgment (relief not requested by petitioners in this case), it did so on the ground that the issue presented was "likely to recur if not judicially resolved" (*id.* at 248). In this case, given that both the majority and the dissenters of this panel unanimously express the view that respondents' construction of the applicable zoning provision is erroneous, we do not believe that the issue presented is likely recur. Similarly, given the concurrence of the majority and the dissent on the merits of the zoning issue raised in this case, in the unlikely event that a future dispute were to raise the same issue, we think it still more unlikely that the issue would evade appellate review by reason of the denial at the trial level of a timely application for injunctive relief.

In *Dreikausen*, the Court of Appeals distinguished both *Watch Hill* and *Pine Bush* as cases in which "[c]ourts . . . have retained jurisdiction notwithstanding substantial completion in instances where novel issues or public interests such as environmental concerns warrant continuing review" (98 NY2d at 173). In this case, the environmental concerns invoked by petitioners are the increased traffic and the aesthetic cost anticipated to result from the enlargement and expansion of the hospital buildings. In view of the advanced stage the work on the project has reached and petitioners' failure to "d[o] all they could to timely safeguard their interests" (*Vitiello*, 255 AD2d at 507), the concerns they invoke, while not to be deprecated, must be weighed against the public interest to be served by the upgrading of respondent hospital's antiquated 1950s-era facilities. The latter interest, to reiterate, is the enhancement of the hospital's ability to treat and rehabilitate sick and disabled children. Taking all of the circumstances into account, we find that the interests invoked by petitioners do not warrant retaining jurisdiction of their appeal notwithstanding their failure to take all available steps to protect their own interests.

We disagree with the dissent's suggestion that respondents' proceeding with the modernization of the children's hospital could reasonably be viewed as an instance of "bad faith," notwithstanding that Supreme Court denied petitioners' motion for a preliminary injunction and petitioners then failed even to request such relief upon this appeal. While we agree with the dissent that, on balance, petitioners have the stronger argument on the merits, not even petitioners have suggested that respondents' position on the merits is frivolous or lacking in a good faith basis. If petitioners wished to cast the risk of going forward with the work upon respondents, it was imperative for them at least to seek relief preserving the status quo at each

stage of the proceeding, including the appeal to this Court. The Court of Appeals has expressly rejected the argument that a party suing to halt construction need not seek a preliminary injunction if it anticipates that the bonding requirement for such relief will exceed the amount it wishes to provide. In *Citineighbors*, the petitioners "did not try to enjoin construction during this litigation's pendency, nonfeasance that they chalk up to 'monetary constraints' and the unlikelihood of success. In short, petitioners simply assumed that Supreme Court would not grant them injunctive relief or, in the alternative, would require an undertaking in an amount more than they could or wanted to give. Under *Dreikausen*, however, petitioners were required, at a minimum, to seek an injunction in the circumstances presented here. Having pursued a strategy that foisted all financial risks (other than their own legal fees and related expenses) onto the property owner and the developer, petitioners may not expect us to overlook the substantial completion of this construction project" (2 NY3d at 729-730).

Finally, while the dissenter states that he "seriously doubt[s] the veracity of the respondents' statements that the structure is virtually completed," we find that respondents have established that, as of the time the appeal was argued, the construction was so far advanced that it could not be undone without undue hardship. Under this standard, the construction need not be "virtually completed" to render the dispute moot (*see William Israel's Farm Coop.*, 25 AD3d at 517 [appeal was dismissed as moot where the petitioner did not seek injunctive relief against the construction and "the new building's superstructure (was) 75% complete"]). That the current stage of the construction is not reflected in the record is irrelevant because "mootness is an issue that can be raised at anytime and, in fact, it is incumbent upon counsel to inform the court of changed circumstances which render a matter moot" (*Gabriel v Prime*, 30 AD3d at 956 [internal quotation marks, brackets and citation omitted]). Concur—Friedman, Freedman and Manzanet-Daniels, JJ.

Saxe, J.P., and Catterson, J., dissent in a memorandum by Catterson, J., as follows:

I must respectfully dissent. In my opinion, by dismissing this appeal as moot and declining to reach the merits of the zoning issue the majority has essentially affirmed an error of law. As set forth more fully below, the error fatally infects the State Environmental Quality Review (hereinafter referred to as SEQRA) negative declaration issued on the project which is a 90,000-square foot expansion of St. Mary's Hospital in the Weeks Woodlands section of Bayside, Queens.

At best, it is disingenuous of the majority to state that it would adopt the dissent's "cogent analysis" on the zoning issue if it had to reach the merits, but then to take the position that it does not need to do so. At worst, the majority tacitly but knowingly affirms an error of law, namely the erroneous interpretation of New York City Zoning Resolution (hereinafter referred to as ZR) § 24-111 (a). This renders the greatest disservice to the petitioners who sought judicial intervention in order to assert their rights against those who, as characterized by the petitioners' counsel at oral argument, have the "power and the money" to proceed with dispatch.[5] In this case, the majority's finding is particularly egregious given that the petitioners' applications for injunctive relief were denied repeatedly by a court that not only ignored the customary analysis appertaining to applications for such relief, but based the denial of the applications solely on its erroneous interpretation of the Zoning Resolution.

More significantly, the majority's holding ignores the fact that the erroneous interpretation of the zoning resolution infects the SEQRA negative declaration on the project issued by the respondent Dormitory Authority of the State of New York (hereinafter referred to as DASNY). Declining to reach the merits of the zoning issue is a total abnegation of this Court's responsibility. (*See Save Audubon Coalition v City of New York*, 180 AD2d 348, 355 [1st Dept 1992] ["(j)udicial review of a lead agency's SEQRA determination is limited to . . . whether, substantively, the determination was affected by an error of law"] [internal quotation marks omitted].)

DASNY's negative declaration was based on a finding that the project will not have a "significant adverse effect on the environment" because it "does not involve the introduction of any land uses or new structures that do not conform to or

---

**5.** It is troubling that the majority stoops to characterizing this latter statement as one intended by the dissent to make an "emotional appeal" considering the majority's emotionally manipulative observation in its very next sentence that the dissent "seems to have lost sight of the fact that [the project is intended for] sick and disabled children." Moreover, the majority's observation demonstrates a rare judicial mean spiritedness in its deliberate mischaracterization of the dissent's position as if emphasizing the legal rights of the petitioners must be equated with disregard for severely disabled children: Whatever the intended use of the facility, it does not alter the fact that those racing to get the project approved, commenced and completed are doing so with a blatant disregard for the rights of the petitioners. For example, the manager of the construction project who, as the record reflects, informed the petitioners in a July 2010 meeting that the work would be conducted after hours, and on Saturday and Sundays, and then added: "we are going to make your lives miserable over the next two years."

comply with existing zoning." In turn, that unequivocal but totally erroneous statement relied on a simplistic interpretation of ZR § 24-111 (a) in conjunction with a confirmation by the Department of Buildings (DOB) that St. Mary's was permitted a maximum floor area ratio of 1.0. The record reflects that the DOB confirmation was conveyed to DASNY by counsel for St. Mary's. The negative declaration and supplemental report are devoid of any suggestion that DASNY investigated any further, or that it was aware of the DOB's inconsistent posture, as set forth more fully below, on the interpretation of the zoning resolution. Or, indeed that it took the required "long hard look" at environmental issues.

For example, DASNY's report on the adverse impact of increased traffic in the neighborhood stated that there would be no adverse impact because the expansion plans did not include an increase of inpatient beds. As the petitioners correctly point out, "inpatients" do not increase traffic. Instead, the critical inquiry should have been into St. Mary's expansion of outpatient/ambulatory services which are the types of daily services that increase traffic around a hospital. It is small wonder that DASNY's SEQRA review of the $200 million project, which, contrary to taking a "long hard look," was completed within 21 business days, now turns out to be based on an error of law.

The majority blithely dispenses with this SEQRA deficiency by summarizing the petitioners' concerns as "increased traffic and the aesthetic cost." This completely misses the point that the SEQRA negative declaration at issue is based on an acknowledged zoning violation. Yet, the majority overlooks this violation of the law because it views the facility as one for a disadvantaged group. Hence, in my opinion, the majority is compelled to fabricate the requirement that injunctive relief *must* be sought in the *Appellate Division*.

In this case, it is undisputed that the petitioners repeatedly and unsuccessfully sought injunctive relief in the court below. The petitioners opposed the expansion on the grounds that it violates ZR § 24-11 (a) which limits the size of community facilities in residential neighborhoods. The hospital is located on 7.7 acres in a neighborhood of single-family detached homes on tree-lined streets. Until its plans for expansion, the hospital operated as a 97-bed inpatient facility for the rehabilitation of disabled children. Now, it plans to double the size of the structures on its property to 168,000 square feet and increase the size of its staff in order to convert from a rehabilitative facility to one providing ambulatory outpatient services. The petitioners claim that the additional transportation required by

outpatients as well as staff will generate much more traffic, noise and pollution. They oppose the construction because, upon completion, the floor to area ratio (hereinafter referred to as FAR[6] ) would increase from 0.38 to 0.77. The petitioners claim this is a 50% larger FAR than permitted by ZR § 24-111 (a).

The respondents in this action include the New York State Department of Health (hereinafter referred to as DOH) which initially approved the project; the New York City Department of Buildings which issued the building permit; DASNY which conducted the SEQRA as well as providing the financing for the project, and St. Mary's.

It is undisputed that St. Mary's is one of the few nonresidential uses in the area, and that the current building was constructed in 1950. In December 2006, St. Mary's submitted a certificate of need for major modernization to DOH. It initially envisaged a new five story addition constructed on the east side of the existing building between the south wing and the cloister garden. The original design attempted to reduce the overall impact of the addition by "tucking" it into the existing facility.

In February 2008, DOH determined that the project was a Type I action for SEQRA purposes and that the lead agency would be Queens County or the authority having jurisdiction. It approved St. Mary's request, subject to certain conditions and contingencies including confirmation that all necessary local zoning approvals had been granted.

On October 6, 2008, St. Mary's sought confirmation from DOB that the maximum FAR for its building was 1. DOB denied the request, stating, "proposed hospital enlargement[/]alteration shall comply with ZR 24-111 with FAR 0.5 or secure BSA [Board of Standards and Appeals] approval for FAR more than 0.5." A FAR of 0.5 denotes that the total floor area of a built structure on a parcel of property cannot exceed half the square footage of that parcel.

ZR § 24-111 (a), adopted on February 28, 1973 as an amendment to the Zoning Resolution of 1961, states that, in the district in which St. Mary's is located, the FAR for community facilities like St. Mary's, shall not exceed the floor area permitted for residential uses which was set at 0.5. The amendment concluded with an exception clause as follows: "The provisions of this paragraph shall not apply to buildings for which plans were filed with the Department of Buildings prior to November 15, 1972, including any subsequent amendments thereof."

---

**6.** FAR is calculated by dividing the total floor area of a structure by the total area of the lot containing the building.

On October 20, 2008, DOB changed its mind, stating, "O.K. to . . . permit FAR of 1.0" because "building was built prior to Nov. 15, 1972." On March 25, 2010, St. Mary's requested approval from DOH for updated project costs, stating that it needed to construct a larger building than originally planned. DOH approved the request on April 9, 2010.

On May 12, 2010, DASNY voted to go forward with the financing of St. Mary's expansion. On May 21, 2010, DASNY proposed to designate itself the lead agency under SEQRA. Within just one month, on June 22, 2010, DASNY issued a negative declaration determining that St. Mary's expansion would "not have a significant adverse effect on the environment."

On June 23, 2010, DASNY's board authorized the issuance of bonds for St. Mary's. On July 12, 2010, DOB issued a building permit, and St. Mary's announced it would begin construction on August 24, 2010. At the time of this appeal, St Mary's was proceeding with the construction of a new 90,000-square-foot building connected to its existing building.

Meanwhile on August 6, 2010, the petitioners brought the instant article 78 proceeding and action for declaratory judgment and injunctive relief against the respondents. They sought a TRO which the court denied on August 20, 2010.

On August 26, 2010, the petitioners filed an amended petition. The petitioners alleged, *inter alia*, that DOB and St. Mary's had failed to comply with ZR § 24-111 (a) and that the projected addition would bring total floor area to 168,000 square feet with a FAR of 0.77. They moved for a preliminary injunction which the court denied. The court found, *inter alia*, that the petitioners had failed to establish a likelihood of success on their argument that the "grandfathering" provision of ZR § 24-111 (a) did not apply to St. Mary's. The court held that "a literal reading of the grandfathering provision would appear to apply to *all* buildings whose plans were filed with DOB prior to November 15, 1972, whether or not they were completed then. Petitioners would effectively have the court insert language into ZR § 24-111 (a) modifying the word 'buildings' so as to apply the provision only to buildings still under construction or in the planning pipeline, the plans for which were filed with DOB prior to November 15, 1972. However, . . . 'new language cannot be imported into a statute to give it a meaning not otherwise found therein' " (2011 NY Slip Op 30286[U], *23-24 [citations omitted]).

The motion court's order was entered January 18, 2011. The petitioners filed a timely notice of appeal on or about March 7, 2011. They perfected the appeal by the end of March, and moved

for a calendaring preference for the June 2011 term. This Court denied the motion on April 14, 2011. (2011 NY Slip Op. 69941[U].)

On or about April 5, 2011, the petitioners moved the court below to renew, and for a TRO enjoining construction pending a decision on the motion to renew. They stated that DOB had responded to their FOIL request after the motion court rendered its initial decision. The response included decisions by DOB and Board of Standards and Appeals (hereinafter referred to as BSA) which interpreted ZR § 24-111 (a) in a manner consistent with the petitioners' interpretation that St. Mary's was prohibited from expanding to a FAR of 1.0.

DOB opposed the petitioners' motion to renew and cross-moved for summary judgment. The petitioners cross-moved for summary judgment on the ground that the building permit that DOB issued to St. Mary's violated ZR § 24-111 (a). While the court rejected respondents' argument "that petitioners fail to provide a reasonable justification for not providing the purported new 'fact' sooner," it nevertheless found that this new fact would not change its prior decision. Therefore, it denied the petitioners' motion to renew. It granted DOB's cross motion for summary judgment dismissing the proceeding against it, and denied petitioners' motion for summary judgment on the issue of ZR § 24-111 (a), stating, "For the reasons set forth in [the prior] decision, . . . the [grandfathering] provision applies to all buildings whose plans were filed prior to November 15, 1972, not merely those that were in the pipeline at that point." (2011 NY Slip Op 32178[U], *19.)

The petitioners appealed on or about August 10, 2011, and the respondents moved to consolidate the two appeals and adjourn them to the December term. The petitioners opposed on the grounds that delaying the preliminary injunction appeal could foreclose it as moot. This Court calendared the appeals for the December term. At oral argument on January 18, 2012, the respondents represented to this Court that the construction of the new building was essentially complete.

On appeal, the petitioners assert that the court below erred in its interpretation of the exception clause in ZR § 24-111 (a), and therefore that it erred in its denial of a preliminary injunction on the grounds that the petitioners would not succeed on the merits of their zoning claim. As the petitioners assert, the court below erroneously construed the zoning ordinance as an "invitation to create non-compliance that was not present before." Moreover, the court's interpretation is simply not supported by legislative history or by the stated purpose or intent

of the City Planning Commission (hereinafter referred to as CPC) the drafter of the Zoning Resolution provision. I agree, and for the reasons set forth below, I would reverse, and grant the petitioners an injunction enjoining the respondents from proceeding with the construction at St. Mary's Hospital until it conforms or obtains an area variance.

As a threshold matter, the decision to grant or deny a preliminary injunction lies within the discretion of the motion court and generally should not be disturbed unless it is demonstrated that the court abused its discretion. (*See Borenstein v Rochel Props.*, 176 AD2d 171 [1st Dept 1991].) Here, however, the court did not make the determination as an exercise of discretion by weighing the elements upon which a preliminary injunction is usually granted or denied. (*See Aetna Ins. Co. v Capasso*, 75 NY2d 860, 862 [1990] [in addition to likelihood of success, movant must show irreparable harm in absence of injunction, and the balance of equities in movant's favor].) Instead, it denied the preliminary injunction based solely on its determination that statutory interpretation forecloses the petitioners' zoning claim. Unfortunately, as the majority agrees, the court below erred on the law.

It is well settled that "[t]he primary consideration of the courts in the construction of statutes is to ascertain and give effect to the intention of the Legislature." (McKinney's Cons Laws of NY, Book 1, Statutes § 92 [a]; *see e.g., Matter of M.B.*, 6 NY3d 437, 447 [2006].)

The intention of the Legislature is first to be sought from "a literal reading of the act itself." (McKinney's Cons Laws of NY, Book 1, Statutes § 92 [b].) However, a "literal application" will be rejected where it would "substantially compromise[ ]" the "meaning and effect" of a statute. (*Matter of LaCroix v Syracuse Exec. Air Serv., Inc.*, 8 NY3d 348, 355 [2007].) Courts are not foreclosed from considering legislative history. (*Matter of M.B.*, 6 NY3d at 449, 451.)

Further, statutes must be given "a reasonable construction, it being presumed that a reasonable result was intended by the Legislature." (McKinney's Cons Laws of NY, Book 1, Statutes § 143.) Nor should statutes be construed in a manner that would make them "absurd." (McKinney's Cons Laws of NY, Book 1, Statutes § 145; *see also Matter of Medical Socy. of State of N.Y. v State of N.Y. Dept. of Health*, 83 NY2d 447, 451-452 [1994].)

In relevant part, the exception clause of ZR § 24-111 (a) states that the provisions restricting community facilities to a FAR of 0.5 "*shall not apply to buildings for which plans were filed with [DOB] prior to November 15, 1972 including any subsequent*

*amendments thereof"* (emphasis added). Respondent St. Mary's, on appeal, imports the language of the court below in its entirety, arguing that the court construed the exception clause according to "its natural and most obvious sense"; that the plain text would appear to apply to all buildings whose plans were filed prior to November 15, 1972; and that the petitioners are impermissibly urging the court below to insert language modifying the word "buildings" so as to apply the provision only to buildings still under construction or in the "pipeline."

St. Mary's states that its original certificate of occupancy is dated 1952, and that it provides that plans for St. Mary's were filed in 1948. St. Mary's therefore concludes simply—and simplistically: "Since the plans were filed with Department of Buildings before 1972, [St. Mary's Hospital] is not subject to ZR section 24-111 (a)'s restriction to a 0.5 FAR."

Moreover, relying on "the ordinary definition of amendment, that is correction or modification" respondent adds: "[A]s DOB pointed out, and as Supreme Court correctly held the plans for the horizontal enlargement are a 'subsequent amendment' to the original plans, in that the enlargement is a modification of the scope of the project as shown in plans filed prior to 1972."

Such an interpretation, however, violates a cardinal rule of statutory construction by impermissibly rendering superfluous a phrase of the provision drafted by the legislative body, in this case, the CPC. (*See Levine v Bornstein*, 4 NY2d 241, 244 [1958] ["all parts of an act are to be read and construed together to determine the legislative intent"].) The interpretation desired by the respondents does not require the phrase "including any subsequent amendments thereof." Had the drafters truly intended to grant a community facility like St. Mary's a continuing and eternal right to expand its building up to a FAR of 1.0, just because plans for its 1951 facility were filed before November 15, 1972, it could have accomplished the exemption by simply stating that "the provisions shall not apply to buildings for which plans were filed prior to November 15, 1972." St. Mary's contention that "subsequent amendments" in this case refers to the plans for the *new* construction at St. Mary's Hospital does not render it any less superfluous: There simply would be no necessity for the phrase if St. Mary's interpretation of the provision were the correct one.

On the other hand, I find persuasive the petitioners' assertion that the term "subsequent amendments" has a specific meaning which precludes the term being applied loosely to any modification or alteration—especially one made more than 60 years after the original plans were filed. In the absence of defini-

tions in the Zoning Resolution itself, the petitioners rely on the City Construction Code asserting as follows: that the phrase "subsequent amendments thereof" in the context of ZR § 24-111 (a) refers to amendments to the "plans filed prior to November 15, 1972." As such, pursuant to the New York City Administrative Code, subsequent amendments to plans or "approved construction documents" filed prior to November 15, 1972 *"shall be submitted, reviewed and approved before* the final inspection of the work . . . is completed." (Administrative Code of City of NY §§ 28-104.3, 28-101.5 [emphasis added].) A final inspection is performed by the DOB prior to the issuance of a new or amended certificate of occupancy, or a letter of completion. (Administrative Code of City of NY §§ 28-116.2.4.1, 28-116.2.4.2.)

Thus, any "subsequent amendments" to the hospital plans filed in 1948 would be amendments reflecting changes or modifications to the hospital building envisioned in the 1948 plans and could have been submitted *only before* the 1951 facility was completed and before the issuance of its certificate of occupancy. The respondents make no such claim for their current plans.[7]

Contrary to the motion court's decision, therefore, no new language needs be imported into the exception clause to limit the "buildings" therein to projects in the pipeline. The reference to "subsequent amendments" *per se* limits the scope of the exception clause to projects which were commenced prior to November 15, 1972 and were still "in the works" awaiting final inspection and certificates of occupancy. Hence, I conclude that the term "subsequent amendments" simply cannot apply to plans filed by St. Mary's with DOB in 2010, more than a half-century after St. Mary's original plans were filed with DOB.

This interpretation is further supported by the legislative history of the 1973 Zoning Resolution, and comports with the legislative intent of CPC as expressed in its report recommending adoption of the provisions. The report establishes that in 1973, CPC clearly intended to correct the overbuilding of community facilities in residential neighborhoods by limiting FAR for projects that would negatively impact residential neighborhoods in the future. The concern of the drafters was that the availability of "community facilities bulk . . . has caused build-

---

7. On the contrary, it should be noted that, at oral argument, counsel for St. Mary's impliedly conceded that the plans for the new construction are not the "subsequent amendments" contemplated by ZR § 24-111 (a) by refusing repeatedly to answer the question as to how the plans could be described as "amendments."

ings out of character with the surrounding residential development and has overburdened the streets and other supporting services in the area." The report highlights the fact that "[t]hese facilities in R1 and R2 Districts [like Weeks Woodland] are usually developed on large lots and have made use of building types more than 4 or 5 stories high which are out of scale with the typical building type in [those] districts. Frequently they are constructed with a total disregard of the topography of the area and the existing local street patterns which are inadequate to handle the traffic generated by these uses."

The report states clearly that the provisions aimed at reducing the FAR are intended to guide the development of "[a] significant number of [community facilities which] *are presently being built or planned* using community facilities bulk" (emphasis added). The CPC report, however, recognized the "concern of sponsors who have invested large amounts of time and energy on preparing plans for these facilities and who fear the delay occasioned by another round of approvals."

The report further states: "[Community facilities] may continue to locate in R1 to R7 residential districts as-of-right so long as they have the same floor area ratio as residential buildings. In R1 and R2 districts, floor area bonuses will go as-of-right only to those community facilities which had their plans on file with the [DOB] *as of* November 15, 1972" (emphasis added). Hence, it is evident, that the CPC enacted the provisions for community facilities *in the process* of being planned, constructed and built at that time. As the petitioners assert, it is more logical to draw the inference that the purpose of the exception clause was to protect a developer's investment in current plans rather than exempt non-conforming structures for which plans had not been filed—and would not be filed for another 37 years.

Specifically, the use of "as of" in the context of discussing ongoing projects suggests a "cut-off" date/deadline for projects in the planning stages at the time the 1973 provisions were being drafted. Neither the tenor nor the language of the report even remotely suggests that November 15, 1972 is a "grandfathering" date allowing future expansion up to a FAR of 1 by *all* the buildings *already in existence* throughout the city.

Interestingly, in September 2011, CPC issued proposals for new amendments to the Zoning Resolution. One was a proposal to amend ZR § 24-111 (a) by deleting the exception clause on the grounds that it is "obsolete." This proposal was characterized as a technical amendment, a description of those amendments which the CPC, after checking with DOB, believed were not subject to dispute.

Although as a consequence of this litigation and the DOB's current interpretation, CPC subsequently abandoned the proposal, nevertheless its initial stated intent to delete the exception clause indicates its view that there was no entity left to take advantage of the exemption. As the petitioners argue, if the exception clause meant what the respondents assert it means, CPC would not have proposed deleting it for "obsolescence."

More significantly, the record reflects that DOB has interpreted the exception clause inconsistently. Until October 20, 2008 when DOB reversed its opinion and granted St. Mary's a permit for its expansion plans, it appears to have adhered to the interpretation urged by the petitioners.

In their motion to renew, the petitioners presented evidence, obtained after a formal FOIL request, that in 2006, DOB denied an application for expansion by Our Lady of Snow Church, Queens, also defined as a community facility under the ZR. The church argued that the exception clause of ZR § 24-111 (a) allowed such an expansion. DOB rejected the argument stating: "[t]he . . . statement pertaining to Bldg plans filed prior to 11/15/1972 is intended as a *vesting provision* to allow Bldgs filed prior to the effective date of the Zoning amendment *to continue* in compliance with the prior zoning allowable floor area."

Furthermore, DOB initially denied St. Mary's application on the same basis. When the agency reversed itself within a period of just 14 days, it gave an explanation totally at odds with its prior denials, that is, it exempted St. Mary's from the 0.5 FAR because "building was built prior to Nov. 15th, 1972." DOB gave no explanation for its change of position. It now states, without explanation, that its ruling in the Our Lady of Snow application was "erroneous."

Lastly, the petitioners correctly assert that their interpretation of the exception clause comports with the well established requirement that "grandfathering" provisions must be narrowly construed. (*Matter of Albert v Board of Stds. & Appeals of City of N.Y.*, 89 AD2d 960, 961-962 [1982], *appeal dismissed* 59 NY2d 673 [1983] ["(w)hile it is customary for a zoning ordinance to be strictly construed in favor of the property owner, there are countervailing considerations when the ordinance limits the extension of nonconforming uses, because such uses detract from the effectiveness of the comprehensive zoning plan"] [citations omitted].)

Given the finding that the petitioners would prevail on their zoning claim, I would reject the respondents' argument that both appeals are moot because construction is "substantially

complete." First, I seriously doubt the veracity of the respondents' statements that the structure is virtually completed. Second, even if this fact was reflected in the record, in my opinion, it could not defeat the petitioners' right to appellate review. No public policy justifies abrogating that right simply because a party with the means to press on regardless with a multi-million dollar construction has done so. Any argument that emphasizes the ground gained in the respondents' race to complete construction has been explicitly and soundly rejected by the Court of Appeals. (*See Dreikausen*, 98 NY2d at 172 ["a race to completion cannot be determinative"].) The Court was unequivocal in its holding that "relief remains at least theoretically available even after completion of the project. Simply put, *structures changing the use of property most often can be destroyed* " (*id.* [emphasis added]; *see also Matter of Citineighbors Coalition of Historic Carnegie Hill v New York City Landmarks Preserv. Commn.*, 2 NY3d 727, 729 [2004]).

The Court provided guidelines for evaluating mootness. Chief among the factors it enumerated is "a challenger's failure to seek preliminary injunctive relief." (*Dreikausen*, 98 NY2d at 173; *see also Citineighbors*, 2 NY3d at 730 ["under <u>Dreikausen</u> . . . petitioners were required, at a minimum, to *seek* an injunction"] [emphasis added].) In *Dreikausen* and *Citineighbors*, the petitioners did not seek a TRO or a preliminary injunction when they filed their article 78 proceeding. (*See* 98 NY2d at 171; 2 NY3d at 728.) By contrast, in the case at bar, the petitioners sought a TRO when they filed their original petition, but it was denied. They sought a preliminary injunction in their amended petition in August 2010, but the court denied it in January 2011. Subsequently, they moved to renew, and again made an application for a preliminary injunction, which was also denied. The respondents' further reliance on *Dever v DeVito* (84 AD3d 1539 [3d Dept 2011], *lv dismissed* 18 NY3d 864 [2012]) and *Matter of Sherman v Planning Bd. of Vil. of Scarsdale* (82 AD3d 899 [2d Dept 2011]) is misplaced even though the petitioners acknowledge that the requirement to provide a bond for delaying construction of a multi-million dollar project has deterred them from seeking a stay in this Court. In *Dever*, the appellant not only failed to seek a stay in the Appellate Division but also "eventually withdrew her appeal and thereafter failed to pursue any additional legal relief to preserve the status quo or prevent further construction of defendants' residence." (84 AD3d at 1541.) In *Sherman*, the appellants not only failed to move for a preliminary injunction in the Appellate Division but also failed to so move in Supreme Court. (82 AD3d at 899-900.) Indeed, the record reflects that petitioners in this case have had applica-

tions for either a TRO or a preliminary injunction pending before the court below for 9 of the 12 months that the case was before that court.

In my opinion, while it is clear that the Court in *Matter of Fallati v Town of Colonie* (222 AD2d 811 [3d Dept 1995])—a case upon which the majority relies because it is cited with approval by the Court of Appeals—found mootness when petitioner failed to seek injunctive relief in the Appellate Division, it is equally clear that in *Matter of Watch Hill Homeowners Assn. v Town Bd. of Town of Greenburgh* (226 AD2d 1031 [3d Dept 1996], *lv denied* 88 NY2d 811 [1996]), also cited with approval by the Court of Appeals, petitioner's failure to repeatedly seek injunctive relief did not lead to dismissal of the appeal. In my opinion, the majority's reasoning that, because two justices were common to the panels of both cases, *Watch Hill* does not abrogate or relax the requirement of moving for relief "at each level of litigation," is incoherent. Specifically, the majority does not address the import of the plain and unequivocal language of *Watch Hill* which appears to apply directly to the case at bar: "While construction . . . can render a challenge of this type moot when the petitioner has not made *any* attempt to preserve its rights pending judicial review . . . that is not the circumstance here, for petitioner sought preliminary injunctive relief— which was denied—as soon as it became aware that construction was imminent. Respondents were thus placed on notice that if they proceeded with construction, it would be at their own risk." (*Matter of Watch Hill*, 226 AD2d at 1032 [emphasis added].)

In other words, a finding of mootness is not mandated by the fact that a petitioner has failed to seek injunctive relief at any particular *stage of litigation;* rather the analysis must focus on the *stage of construction*, and whether a petitioner has *sought* injunctive relief before construction is substantially completed. (*See Matter of Dreikhausen v Zoning Bd. of Appeals of City of Long Beach*, 98 NY2d 165, 171-174 [2002].)

The majority's dictate that the petitioners should have immediately come to this Court blatantly ignores the fact that in August 2010 on the day the TRO (temporary restraining order) was denied, the motion court *immediately* set the case down for oral argument on a preliminary injunction for early September, and the application was before that court until January 2011 when the motion court's denial was entered as an order.

The respondents were therefore on notice prior to beginning construction. Specifically, they were on notice, as of the petitioners' motion to renew in April 2011, of the fact that even the

DOB had at one time interpreted the zoning resolution exemption to include only projects in the pipeline as of November 1972. It is, therefore, of no relevance, in my opinion, that they did not come "immediately" to this Court when their application for a TRO was denied on August 20, 2010.

Instead, I find that the respondents' increased construction activity at this time is all the more egregious since it strongly suggests that they simply ignored the admonition of the Court of Appeals that "a race to completion cannot be determinative." (*Dreikhausen*, 98 NY2d at 172.)

In my opinion, the majority paints itself into a corner because it appears to ignore the *Dreikhausen* Court's holding that mootness, and consequently dismissal of an appeal, is found by "weighing" various factors. In turn, weighing means assessing the relative importance or significance of the factors in a given set of circumstances. Hence, in some cases, courts have dismissed appeals because petitioners waited until construction was virtually complete before seeking injunctive relief; in others "notwithstanding . . . completion . . . novel issues or public interests such as environmental concerns warrant continuing review." (*Dreikhausen*, 98 NY2d at 173, citing with approval *Matter of Friends of Pine Bush v Planning Bd. Of City of Albany*, 86 AD2d 246 [3d Dept 1982] [appeal should not be dismissed on ground of mootness since a question of general interest and substantial public importance is present and is likely to recur if not judicially resolved], *aff'd* 59 NY2d 849 [1983]; *Watch Hill*, 226 AD2d 1031.)

In declining to rule on the zoning issue, the majority leaves the door open for any community facility which initially filed plans before 1972 to be granted permission by DOB to expand up to a maximum floor to area ration (hereinafter referred to as FAR) of 1.0 in an R2A residential neighborhood. The majority's view that agreement by the majority and dissent on the interpretation of the zoning regulation tends to make such a situation unlikely to recur, in my opinion, is simply an evasion of the issue since that interpretation is nothing more than dicta at this point.

Finally, the Court of Appeals determined that an equally significant factor in evaluating mootness is whether the work was undertaken without authority and in bad faith. (*Dreikausen*, 98 NY2d at 173.) While St. Mary's did obtain approval from the DOH and DOB, it cannot be said that it was unaware that the petitioners alleged a zoning violation. The petitioners filed a challenge with DOB, then filed their petition with Supreme Court. Subsequently the petitioners moved to renew, and noticed appeals in both proceedings.

Thus, the respondents were aware or should have been aware, at the very least, that the exception clause of ZR § 24-111 (a) has been interpreted inconsistently by DOB, and that the CPC determined to delete it on the grounds of obsolescence. Hence, in my opinion, no respondent should have been sanguine about the interpretation of the provision; nor could any of the respondents have been advised that appellate review would be a foregone conclusion. Proceeding with construction with dispatch could be viewed as an "unseemly race to completion intended to moot petitioners' lawsuit." (*Cf. Citineighbors*, 2 NY3d at 729.) In this case, for example, according to the petitioners' affidavits on which the court below relied, on the day of April 25, 2011, with the petitioners' appeal and a motion to renew pending, "141 trips" were made through the neighborhood by a front-end loader, and the construction company advised the petitioners that work was likely to continue through "some weekends." Moreover, the respondents ensured their "edge" in the race by opposing the petitioners' motion for expediting the first appeal, and by initiating a series of motions that delayed the date of argument. Hence, barely six months later when the respondents submitted briefs for this appeal, they were ready to argue, albeit without citation to any admissible evidence, that the petitioners' challenge was moot because foundations had been poured and the steel superstructure was 70% completed. In particular, the argument of respondents St. Mary's and DASNY's on appeal should give this Court reason to view the continuing construction as such an "unseemly race." Relying on *Knaust v City of Kingston* (157 F3d 86, 88 [2d Cir 1998]), the respondents purport to inform this Court that "[it] lack[s] the power, once a bell has been rung, to unring it." **[Prior Case History: 2011 NY Slip Op 30286(U).]**